## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **WESTERN WATERSHEDS PROJECT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cv-00860 (APM)** |
| | ) | |
| **DAVID L. BERNHARDT, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

### I.    INTRODUCTION

Plaintiffs are a group of non-profit conservation organizations that brought this action to challenge a 2019 Biological Opinion and Incidental Take Statement issued by the U.S. Fish and Wildlife Service, which allows for the lethal removal of 72 grizzly bears from the Upper Green River Area Rangeland Project—the UGRA Project—over the next ten years.  Plaintiffs also contest a portion of the 2019 Biological Opinion that allows ranchers to move their cattle through the Kendall Warm Springs enclosure within the UGRA Project—the sole habitat area of the Kendall Warm Springs dace, an endangered fish species.

Before the court is Plaintiffs' Motion for Preliminary Injunction.  Plaintiffs ask the court to enjoin all lethal removal of grizzly bears from the UGRA Project allotments and all herding of cattle through the Kendall Warm Springs enclosure during the pendency of this case.  The court denied Plaintiffs' Motion by Order dated June 12, 2020.  This Memorandum Opinion provides the reasons for the court's ruling.

## II.    LEGAL BACKGROUND

### A.    The Endangered Species Act

Congress enacted the Endangered Species Act ("ESA") in 1973, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  Under Section 4 of the ESA, the Secretary of the Interior or the Secretary of Commerce—depending on the species at issue—is instructed to "determine whether any species is an endangered or a threatened species" based on five factors[1] and must make that determination "solely on the basis of the best scientific and commercial data available."  *Id.* § 1533(a)(1), (b)(1).  The Secretary should also take into account any efforts being made by a state "to protect such species."  *Id.* § 1533(b)(1).  An "endangered species" is defined as "any species which is in danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  "[T]hreatened species" means "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

Section 9 of the ESA prohibits the "taking" of any endangered species.  *Id.* § 1538(a)(1)(B).  To "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  "Harm" is further defined as "an act which actually kills or injures wildlife," including actions that result in

---

[1] The Secretary shall by regulation . . . determine whether any species is an endangered species or a threatened species because of any of the following factors:

      (A)  the present or threatened destruction, modification, or curtailment of its habitat or range;

      (B)  overutilization for commercial, recreational, scientific, or educational purposes;

      (C)  disease or predation;

      (D)  the inadequacy of existing regulatory mechanisms; or

      (E)  other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).

"significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. The prohibition on taking of endangered species applies to individuals, corporations, state and federal agencies, government employees, and state and local governments. 16 U.S.C. § 1532(13).

Once a species is listed as endangered or threatened, Section 7 requires that federal agencies consult with the relevant Secretary to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species." *Id.* § 1536(a)(2). As part of the consultation process, the acting agency must make a biological assessment to determine the impact of the proposed action on any listed species. *Id.* § 1536(c)(1). If the biological assessment determines that a proposed action is likely to adversely affect a listed species, the agency must participate in a formal consultation with the United States Fish and Wildlife Service ("FWS"). 50 C.F.R. § 402.14(a), (b)(1). During the consultation process, FWS must take a number of factors into consideration, including: (1) "[r]eview[ing] all relevant information provided by the Federal agency or otherwise available," including "an on-site inspection of the action area"; (2) "[e]valuat[ing] the current status . . . of the listed species"; (3) "[e]valuat[ing] the effects of the action and cumulative effects on the listed species"; and (4) "us[ing] the best scientific and commercial data available." *Id.* § 402.14(g). The agency has an obligation to provide FWS with the "best scientific and commercial data available" to it, including any "studies or surveys" conducted by the agency. *Id.* § 402.14(d). At the conclusion of the consultation, FWS must issue a biological opinion detailing "how the agency action affects the species or its critical habitat" and whether it will "jeopardize the continued existence of the

any endangered or threatened species." 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(g). If FWS makes a "no jeopardy" finding, it may allow for incidental take of the species. 16 U.S.C. § 1536(b)(4). Section 7 also requires an "incidental take statement," which "specifies the impact of such incidental taking on the species." *Id.* § 1536(b)(4)(C)(i); *see also* 50 C.F.R. § 402.14(g)(7). In some situations, an agency must re-initiate Section 7 consultation. *See* 50 C.F.R. § 402.16.

### B.    The National Forest Management Act

The National Forest Management Act of 1976 ("NFMA") establishes a framework for the United States Forest Service ("USFS"), an agency of the Department of Agriculture, to "develop, maintain, and . . . revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). USFS "develops land and resource management plans pursuant to NFMA, and uses the[ ] forest plans to 'guide all natural resource management activities,' including use of the land for 'outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness.'" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729 (1998) (quoting 36 C.F.R. § 219.1(b) (1997)); 16 U.S.C. § 1604(e)(1)); *see also Hammond v. Norton*, 370 F. Supp. 2d 226, 236 (D.D.C. 2005). In developing a forest plan, USFS "must take both environmental and commercial goals into account." *Ohio Forestry*, 523 U.S. at 729. Then, USFS "analyzes and authorizes site-specific projects consistent with the governing plan." *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009); *see also Ohio Forestry*, 523 U.S. at 730; 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.").

4

### III.    FACTUAL BACKGROUND

### A.    The Upper Green River Area Rangeland Project

In October 2019, USFS authorized the Upper Green River Area Rangeland Project, which allows livestock grazing on six allotments in western Wyoming.  Pls.' Mot. for Preliminary Injunction, ECF No. 15, Mem. of P. & A. in Supp. of Pls.' Mot. for Preliminary Injunction, ECF No. 15-1 [hereinafter Pls.' Mot.], Ex. 1, UGRA Project Record of Decision, ECF No. 15-6 [hereinafter UGRA Record of Decision]; *see also* Pls.' Mot., Ex. 3, Upper Green River Area Rangeland Project Final Environmental Impact Statement, ECF No. 16-1 [hereinafter UGRA FEIS]; Fed. Defs.' Opp'n to Pls.' Mot. for Preliminary Injunction, ECF No. 26 [hereinafter Fed. Defs.' Opp'n], Decl. of Chad Hayward, ECF No. 26-1 [hereinafter Hayward Decl.], ¶ 4.[2]  The project area spans 170,643 acres and is located within the Greater Yellowstone Ecosystem ("GYE").  UGRA Record of Decision at 2; Hayward Decl. ¶ 4.  The GYE is a 9,209-square mile region that spreads across northwest Wyoming and parts of Idaho and Montana.  Compl., ECF No. 1 [hereinafter Compl.],  ¶ 44; *see also* Pls.' Mot., Ex. 2, 2019 Biological Opinion and Incidental Take Statement, ECF No. 15-7 [hereinafter 2019 BiOp], at 15.  The ecosystem is made up of national forests, wildlife refuges, public, private, and tribal lands, and the Yellowstone and Grand Teton national parks.  Compl. ¶ 44 (citing *Greater Yellowstone Ecosystem*, Nat'l Park Serv., https://www.nps.gov/yell/learn/nature/greater-yellowstone-ecosystem.htm (last updated Dec. 12, 2019)); *see also* 2019 BiOp at 15–16.  There are 19 Term Grazing Permits for the project area, and a total of 7,765 cattle are permitted on the allotments from June 16 through October 15.  Hayward

---

[2] Because this is an administrative review case involving a preliminary injunction, the court may consider the extra-record declarations attached to the parties' briefing.  *See Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 247 (D.D.C. 2003) (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).

Decl. ¶ 5–6.  To date, for the 2020 grazing season permittees have been authorized to graze a total of 6,598 cattle.  *Id.* ¶ 6.

**B.    The Grizzly Bear in the Upper Green River Area Rangeland Project**

In the 1970s, the grizzly bear population in the United States had dwindled to a fraction of its original size due to hunting, government-sponsored eradication efforts, and habitat loss.  Compl. ¶ 41 (citing Ex. 5, Grizzly Bear Recovery Plan (1993), ECF No. 15-9,[3] p. ii).  Fewer than 1,000 bears remained.  *Id.*; *see also* 2019 BiOp at 13.  In response, the Department of the Interior formed the Interagency Grizzly Bear Study Team ("IGBST") in 1973, for monitoring and research of the species.  *Id.* ¶ 45. (citing *Interagency Grizzly Bear Study Team*, UNITED STATES GEOLOGICAL SURVEY, https://www.usgs.gov/science/interagency-grizzly-bear-study-team?qt-science_center_objects=0#qt-science_center_objects (last visited June 18, 2020) [hereinafter Interagency Grizzly Bear Study Team Overview]).  The IGBST now consists of scientists and biologists from FWS, USFS, the United States Geological Survey, the National Park Service, the Eastern Shoshone and Northern Arapaho Tribal Fish and Game Department, and the state wildlife agencies of Wyoming, Idaho, and Montana.  Interagency Grizzly Bear Study Team Overview.  In 1983, the Interagency Grizzly Bear Committee ("IGBC") was formed to "ensure recovery of viable grizzly bear populations and their habitat in the Lower 48 states through interagency coordination of policy, planning, management, and research."  *About the IGBC*, INTERAGENCY GRIZZLY BEAR COMMITTEE, http://igbconline.org/about-us/ (last visited June 18, 2020).[4]  The IGBC consists of representatives from the same agencies as the IGBST.  *Id.*  The leader of the IGBST "serves as a

---

[3] Available at: https://www.fws.gov/mountain-prairie/es/species/mammals/grizzly/Grizzly_bear_recovery_plan.pdf.

[4] The court may take judicial notice of documents provided on official government websites.  *See, e.g.*, *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 62 n.2 (D.D.C. 2019) ("[J]udicial notice may be taken of government documents available from reliable sources."); *Kelleher v. Dream Catcher, L.L.C.*, 221 F. Supp. 3d 157, 160 n.2 (D.D.C. 2016) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies." (quoting *Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 34 (D.D.C. 2014))).

technical and science advisor to the Interagency Grizzly Bear Committee and its Yellowstone Ecosystem Subcommittee."  Interagency Grizzly Bear Study Team Overview.  "In an effort to facilitate consistency in the management of grizzly bear habitat within and across ecosystems, the Interagency Grizzly Bear Guidelines were developed by the [IGBC]" in 1986 "for use by land managers."  2019 BiOp at 17.  Guidelines were developed for each of the five grizzly bear ecosystems, including the GYE.  *Id.*  The Guidelines were revised in 2007 and 2017.  *See* 2019 BiOp at 17–18; Fed. Defs.' Opp'n at 12.

The grizzly bear was first listed as a threatened species under the ESA in 1975.  Compl. ¶ 42 (citing 40 Fed. Reg. 31,736 (July 28, 1975)).  Since receiving federal protection, the grizzly bear population has grown to more than 2,000 individuals.  *Id.* ¶ 43 (citing 2019 BiOp at 13–14).  Today's grizzly bear population is spread among five distinct population areas, one of which is the GYE.  *Id.* ¶ 43 (citing 2019 BiOp at 13–14).  As of 2017, an estimated 718 grizzly bears live in the GYE.  *Id.* ¶ 53 (citing Yellowstone Grizzly Bear Investigations 2017, Annual Report of the Interagency Grizzly Bear Study Team, p. 2 (2017)[5]); *see also* 2019 BiOp at 14.

Grizzly bears have large home ranges—for females it is typically an area of 81 square miles, and for males 309 square miles.  Compl. ¶ 47 (citing 2019 BiOp at 12).  Based on the GYE bear population and habitat, the IGBST identified a "Primary Conservation Area" as well as adjacent areas "where occupancy by grizzly bears is anticipated and acceptable."  Compl. ¶ 52 (quoting 2016 Conservation Strategy for the Grizzly Bear in the Greater Yellowstone Ecosystem, at 1[6]).  The Primary Conservation Area and adjacent areas make up the Demographic Monitoring Area for the GYE bears.  *Id.*  Based on the estimated grizzly bear population within the Demographic Monitoring Area, FWS set mortality thresholds of 9 percent for independent female

---

[5] Can be found in the partial administrative record at FS-PAR-003745–FS-PAR-003890.
[6] Available at: http://igbconline.org/wp-content/uploads/2016/03/161216_Final-Conservation-Strategy_signed.pdf.

bears, 9 percent for dependent young, and 20 percent for independent males.  *Id.* ¶ 54 (citing Grizzly Bear Recovery Plan, Supplement: Revised Demographic Recovery Criteria for the Yellowstone Ecosystem (May 4, 2017) [hereinafter 2017 Grizzly Bear Recovery Plan Supplement], at 6[7]).  Under FWS's Revised Demographic Recovery Plan, "[i]f mortality limits are exceeded for any sex/age class for three consecutive years and any annual population estimate falls below 612 . . . , the IGBST will produce a Biology and Monitoring Review to inform the appropriate management response."  2017 Grizzly Bear Recovery Plan Supplement at 5; *see also* 2019 BiOp at 18.

### C.    Section 4(d) Rule

Grizzly bear taking, broadly speaking, is authorized by regulation.  Under section 4(d) of the ESA, "the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of [threatened] species," and "may by regulation prohibit" taking or other activities forbidden under Section 9.  16 U.S.C. § 1533(d).  In 1975, pursuant to its Section 4(d) power, FWS promulgated a regulation that prohibited the taking of grizzly bears as a threatened species, except in certain limited situations.  50 C.F.R. § 17.40(b).  For example, grizzly bears "may be taken in self-defense or in defense of others" or for "scientific or research activities."  *Id.* § 17.40(b)(1)(i)(B), (D).  Most relevant to this case, the regulation allows the "[r]emoval of nuisance bears," meaning a "grizzly bear constituting a demonstrable but non immediate threat to human safety or committing significant depredations to lawfully present livestock, crops, or beehives."  *Id.* § 17.40(b)(1)(i)(C).  Such bears may be taken, however, only if: (1) "It has not been reasonably possible to eliminate such threat or depredation by live-capturing and releasing"; (2) "[t]he taking is done in a humane manner by authorized Federal, State, or Tribal authorities,

---

[7] Available at: https://ecos.fws.gov/docs/recovery_plan/GYE_RP_Supplement_2017_final.pdf.

and in accordance with current interagency guidelines"; and (3) "[t]he taking is reported within 5 days of occurrence" to FWS. *Id.* The regulations are not limited to grizzly bears in a particular geographic area and, therefore, apply within the GYE and the Upper Green River Area Rangeland Project. *See generally id.* § 17.40(b).

### D.    2019 Biological Opinion and Incidental Take Statement

On April 29, 2019, FWS issued a Biological Opinion for the Effects to the Grizzly Bear from the Upper Green River Area Rangeland Project. *See* 2019 BiOp. The Biological Opinion followed a final environmental impact statement, which "evaluate[d] and authorize[d] continued livestock grazing" in the six Upper Green River allotments. *Id.* at ii. The final environmental impact statement proposed using "livestock management strategies" to "maintain or improve resource conditions," and also included "a variety of Conservation Measures designed to avoid and minimize adverse effects to the threatened grizzly bear." *Id.*; *see also* UGRA FEIS.

The environmental impact statement, prepared by the Pinedale Ranger District of the Bridger-Teton National Forest, is several hundred pages long and provides various options for grazing plans and the impact of those plans, including the effects on wildlife within the Project area. *See generally* UGRA FEIS. Ultimately, it recommends a management plan for the Project area. *Id.* at PDF pp. 9–10. The impact statement addresses in great detail the effects of the Project on grizzly bears, *see, e.g.*, *id.* at 17–18, 146–48, 152–54, 311–31, and "includes a variety of Conservation Measures designed to avoid and minimize adverse effects to the threatened grizzly bear," 2019 BiOp at ii. Critically, for purposes of this case, the statement observes that the "[s]urvival of adult female grizzly bears in the [GYE] is most important factor influencing population trend." UGRA FEIS at 316.

The Biological Opinion concludes "that the anticipated adverse effects resulting from the issuance of grazing permits by the Forest [Service] for the [UGRA] Project . . . will not jeopardize the continued existence of the grizzly bear." 2019 BiOp at ii. And "[b]ased on population trends and the number of removals over the last nine years, the incidental take statement (ITS) exempts a total of 72 grizzly bear mortalities over the 10-year timeframe of the proposed action." *Id.* The Biological Opinion provides "for review within consecutive 3-year periods . . . to evaluate the accuracy of [FWS's] estimates and, if necessary, to consider whether additional conservation actions are advisable." *Id.* The Biological Opinion also sets forth a number of conservation measures to help prevent conflicts between livestock and grizzly bears, *id.* at 7–8, looks at historical data for grizzly mortalities, *id.* at 20, and evaluates threats to the bear population, *id.* at 22–25. It considers past numbers of management removals, *id.* at 31, 36, 38, and predicts future removals over the next decade, *id.* at 44. Importantly, the Biological Opinion describes various strategies that can be implemented to deal with depredating bears before resorting to a lethal removal. *Id.* at 34–35. FWS concludes that the anticipated level of grizzly bear mortality will keep the population within the "demographic recovery criterion" and mortality thresholds, and accordingly made a "no jeopardy" finding for the Project. *Id.* at 46.

The Incidental Take Statement included with the Biological Opinion analyzes the expected incidental take resulting from the project and sets forth three terms and conditions, which the USFS "must comply with" "[i]n order to be exempt from the prohibitions of Section 9 of the ESA." *Id.* at 50. The terms and conditions require:

> T&C1. If the amount of grizzly bears that are lethally removed related to grazing activities on the Allotments exceed the 3-year period as described above, the Forest will contact the Service to evaluate the circumstances, re-evaluate our assumptions, and discuss the adequacy of existing mechanisms to minimize take.

T&C2. The Forest will contact the Service if and when the amount of incidental take is reached.

T&C3. The Forest will, in coordination with the Service, annually (or more often as necessary) review the effectiveness of the Forest's Conservation Measures and other management efforts outlined in the 2019 Biological Assessment as they apply to the Allotments and describe the progress of the proposed action, including impacts to the grizzly bear (50 CFR 402.14(l)(3)). This review shall consider adverse effects resulting from Project activities, including grizzly bear and grazing conflicts and resolutions for these Allotments within the Forest, and will be in writing.

*Id.*

In October 2019, FWS released a Record of Decision for the UGRA Project, which provided that "livestock grazing will continue to be authorized" on the six allotments. UGRA Record of Decision at 5. The decision details the expected threats to the grizzly bear population and provides guidelines for preventing depredation. *Id.* at 20–21, 25–26.

### E.    The Kendall Warm Springs Dace

The Kendall Warm Springs dace is a small fish that lives in the Kendall Warm Springs within the Bridger-Teton National Forest. Compl. ¶ 124 (citing UGRA FEIS at 275). It is found nowhere else in the world. *Id.* The Kendall Warm Springs dace has been considered "endangered" since 1970. *Id.* ¶ 125 (citing 35 Fed. Reg. 16,047 (Oct. 13, 1970)). In 1973, FWS "grandfathered" the endangered status of the dace following the enactment of the ESA. *Id.* (citing 39 Fed. Reg. 1171, 1175 (Jan. 4, 1974)).

The Kendall Warm Springs is a 328-yard tributary to the Green River warmed to a temperature of 85 degrees Fahrenheit by thermal steps. *Id.* ¶ 126 (citing UGRA FEIS at 275). The dace "use various habitats within the channel," including the "shallow pool habitat in the main channel" and "slower channel margin habitat." UGRA FEIS at 275. "Aquatic vegetation" in the

tributary provides important "hiding cover" for the fish. *Id.* Small pools are also considered "valuable habitat." *Id.*

USFS maintains a fence around the Kendall Warm Springs to exclude grazing livestock. Compl. ¶ 129 (citing UGRA FEIS at 289). Cattle are, however, permitted to cross the enclosure when they are being "actively herded" by UGRA Project permit holders. *Id.*; UGRA FEIS at 289; UGRA Record of Decision at 55. USFS has noted that "[w]hen cattle are being herded through the exclosure, there would be some bank and channel alteration, which some believe could have a beneficial effect to the dace habitat but could also cause dace to temporarily switch habitat, elevate turbidity, and alter submergent vegetation cover." UGRA FEIS at 289. USFS's Record of Decision for the UGRA Project notes that livestock grazing "[m]ay affect" but is "not likely to adversely affect" the Kendall Warm Springs dace. UGRA Record of Decision at 24.

## F. Procedural History

Plaintiffs Western Watersheds Project, Yellowstone to Uintas Connection, and Alliance for the Wild Rockies are three non-profit conservation groups that work to protect and restore wildlife and their habitats throughout the western United States. Compl. ¶¶ 16–18. On March 31, 2020, Plaintiffs filed this suit against Secretary of the Interior David L. Bernhardt, the United States Fish and Wildlife Service, and the United States Forest Service. *See generally id.* Plaintiffs challenge the 2019 Biological Opinion and Incidental Take Statement for violating § 7 of the ESA. Defendants violated the ESA, Plaintiffs allege, "by failing to consider the best scientific and commercial data available regarding grizzly bear population dynamics and recovery in the GYE, ignoring important aspects of the problem, arbitrarily relying on ineffective conservation measures that lack certainty and specificity, and failing to rationally justify its exemption from ESA liability the anticipated killing of 72 grizzly bears." Compl. ¶¶ 8–9.

12

Plaintiffs' complaint also alleges violations with respect to the Kendall Warm Springs dace. Plaintiffs claim that USFS and FWS violated the ESA by authorizing the unlawful take of the dace and by failing to engage in formal consultation under § 7 of the ESA prior to allowing livestock crossing at the Kendall Warm Springs enclosure. *Id.* ¶¶ 168–175. Such consultation would typically result in the publication of a biological opinion or incidental take statement, but no such publication occurred. *Id.* ¶ 172.

On May 8, 2020, Plaintiffs filed a Motion for Preliminary Injunction. Pls.' Mot. The Motion maintains that FWS failed to consider "the most important factor regarding the recovery and survival of the GYE grizzly bear population," that is, "minimizing female grizzly bear mortality," Pls.' Mot. at 13, and, in so doing, omitted a specific cap on the number of female grizzlies that can be taken over the next decade, *id.* at 14 ("All or a majority of the bears killed pursuant to the ITS *could* be female."). As evidence that numerical limits should have been placed on lethal removals of female grizzlies, Plaintiffs point to previous Biological Opinions authorizing the UGRA Project. For example, in the 2013 Biological Opinion, FWS allowed the lethal take of 11 grizzly bears over a three-year period but restricted the take of female bears to three. Pls.' Mot. at 6 (citing Pls.' Mot., Ex. 7, 2014 Biological Opinion, ECF No. 15-11 [hereinafter 2014 BiOp], at 3. And one of the Terms and Conditions in the 2014 Biological Opinion directs USFS to contact FWS "[i]f 5 or more grizzly bears are lethally removed, *including 3 or more females*, related to grazing activities on the nine allotments in any given year . . . , to discuss the adequacy of existing mechanisms to minimize additional take." *Id.* at 7 (quoting 2014 BiOp at 43). Accordingly, Plaintiffs assert that "neither the 2019 Biological Opinion nor the accompanying ITS evaluate the effects that any proportion of lethally removed female grizzly bears among the anticipated 72 deaths might have on the UGRA Project allotments or the GYE grizzly bear population." *Id.* at

14.  This is especially important, say Plaintiffs, given FWS's reference to the UGRA Project as a "mortality sink" for female bears.  *Id.* at 6 (citing UGRA FEIS at 325); *see also* 2019 BiOp at 30–31.  Plaintiffs ask the court to "issue an injunction against the lethal removal of grizzly bears from the UGRA Project allotments . . . until this Court has the opportunity to issue a final decision on the merits of this case."  Pls.' Mot. at 25.

Plaintiffs also seek to enjoin ranchers from herding livestock through the Kendall Warm Springs enclosure.  *Id.* at 25.  However, since the filing of Plaintiffs' Motion, USFS and permitted ranchers—who intervened as defendants in this action—have agreed not to conduct cattle crossings in the Kendall Warm Springs enclosure during the pendency of this lawsuit.  Hayward Decl. ¶ 7 ("The Forest Service will not authorize trailing through the Kendall Warm Springs exclosure until a decision is issued in [this case].  Livestock will either be trucked over the existing road through the enclosure or trailed around it."); Cattle Ranchers' Proposed Response in Opp'n to Pls.' Mot. for Preliminary Injunction, ECF No. 21-9 [hereinafter Cattle Ranchers' Opp'n], at 1 n.3 ("Ranchers will agree to move their cattle around the exclosure, instead of passing through, during the pendency of this litigation.").

A week after Plaintiffs asked for injunctive relief, the State of Wyoming moved to intervene as a matter of right.  *See* State of Wyoming's Mot. to Intervene, ECF No. 18.  A few days later, the Upper Green River Cattle Association, Sommers Ranch, LLC, Price Cattle Ranch, Murdock Land & Livestock Co., and the Wyoming Stock Growers Association (collectively "Cattle Ranchers") also moved to intervene.  *See* Mot. to Intervene by Cattle Ranchers, ECF No. 21.  On June 1, 2020, the court granted Wyoming's and the Cattle Ranchers' motions to intervene, determining that the parties had satisfied the conditions of intervention as a matter of right.  Order 06/01/2020, ECF No. 36.  The court held oral argument on Plaintiffs' Motion for

Preliminary Injunction on June 3, 2020. The court also gave Defendant-Intervenors the opportunity for supplemental briefing on the question of Plaintiffs' standing. Rough Tr. from 06/03/2020 Hr'g on Pl.'s Mot. for Prelim. Inj. [hereinafter Rough Tr.], at 10.

The court denied Plaintiffs' motion in a one-page Order issued on June 12, 2020, which stated that a Memorandum Opinion articulating the court's reasoning would follow. 6/12/2020 Order, ECF No. 44.

## IV.    THRESHOLD MATTERS

Before turning to the merits of Plaintiffs' motion for injunctive relief, the court must address two threshold issues: (1) whether Plaintiffs' request for relief is moot with respect to the Kendall Warm Springs dace, and (2) whether Plaintiffs have standing to challenge the authorized taking of nuisance grizzly bears under the 2019 Biological Opinion and Incidental Take Statement.

### A.    Plaintiff's Request for Preliminary Injunctive Relief as to the Kendall Warm Springs Dace is Moot.

"In general, a case becomes moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (quoting *Larsen v. U.S. Navy*, 525 F.3d 1, 3 (D.C. Cir. 2008)). This can occur "when, among other things, the court can provide no effective remedy because a party has already obtained all the relief that it has sought." *Id.* (cleaned up) (quoting *Monzillo v. Biller*, 735 F.2d 1456, 1459 (D.C. Cir. 1984)). A federal court lacks jurisdiction to decide a moot case "because [its] constitutional authority extends only to actual cases or controversies." *Id.* (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983)). These same principles hold true for requests for injunctive relief. *See Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995).

Here, Plaintiffs have "already obtained all the relief that [they have] sought" at the preliminary injunction stage with respect to the Kendall Warm Springs dace; there is no additional relief that the court can grant. *See Jewell*, 733 F.3d at 1204. Plaintiffs have asked for an injunction prohibiting "the herding of cattle through the Kendall Warm Springs exclosure as authorized by the UGRA Project Record of Decision," Pls.' Mot. at 25, but the defendant parties have agreed that such crossings will not occur during the pendency of this case, *see* Hayward Decl. ¶ 7; Cattle Ranchers' Opp'n at 1 n.3. Thus, there is no need for injunctive relief. The court cannot, as Plaintiffs request, Rough Tr. at 31, grant just-in-case injunctive relief. Plaintiffs' request with respect to the Kendall Warm Springs dace is moot.

### B.    Plaintiffs Have Demonstrated Standing for their Grizzly Bear Claim.

Next, the court addresses Plaintiffs' standing with respect to their grizzly bear-related claim. "In order to obtain a preliminary injunction, a party must show . . . a substantial likelihood of success on the merits.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotation marks and citation omitted). "[T]he 'merits' on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction," including a party's standing. *Id.* (citation omitted). "To establish standing, the plaintiff must show (1) it has suffered a 'concrete and particularized' injury (2) that is 'fairly traceable to the challenged action of the defendant' and (3) that is 'likely' to be 'redressed by a favorable decision.'" *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (quoting *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017)). A plaintiff "bears the burden of establishing all three elements of standing," and "[i]n the context of a preliminary injunction" the court "require[s] the plaintiff to show a

substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Id.* at 377 (cleaned up) (quoting *Vilsack*, 808 F.3d at 912–13).

Plaintiffs in this case assert what is known as associational standing. "An association 'has standing to sue under Article III . . . if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013)). When more than one association brings suit, the court need only find that one of them has standing. *Id.* (citation omitted).

The court agrees with Plaintiffs that they easily satisfy the second and third elements of associational standing: Western Watersheds Project, Alliance for the Wild Rockies, and Yellowstone to Uintas Connection are conservation groups that have in an interest in protecting and restoring wildlife and their habitat, Pls.' Suppl. Br. Regarding Art. III Standing, ECF No. 40 [hereinafter Pls.' Suppl. Br.], at 4; *see also* Compl. ¶¶ 16–20, and the injunctive relief requested here does not require a member's participation as a named plaintiff, Pls.' Suppl. Br. at 4. Whether one of Plaintiffs' members would have standing in his own right is a more complicated question.

Defendants challenge the adequacy of Plaintiffs' showing of individual member standing as to all three elements—injury, causation, and redressability. *See* Fed. Defs.' Suppl. Br. on Pls.' Mot. for Prelim. Injunction, ECF No. 39 [hereinafter Fed. Defs.' Suppl. Br.]; Wyoming's Suppl. Br. on Standing, ECF No. 41 [hereinafter Wyoming's Suppl. Br.]; Cattle Ranchers' Suppl. Br. Regarding Pls.' Standing, ECF No. 42 [hereinafter Cattle Ranchers' Suppl. Br.]. Their challenges are unpersuasive.

1.    *Injury*

Plaintiffs central allegation is that "FWS failed to adequately analyze the [UGRA] Project's impacts on female grizzly bear mortality and thereby failed to insure that the UGRA Project and associated lethal removal of 72 grizzly bears would not likely jeopardize the continued existence of those species."  Pls.' Suppl. Br. at 3 (citing Pls.' Br. at 13–16).  This is a classic procedural injury.  *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (describing "an agency's failure to prepare (or adequately prepare) an [Environmental Impact Statement] before taking action with adverse environmental consequences" as an "archetypal procedural injury"); *see also Nat'l Park Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005) (same).  For a procedural-rights plaintiff, a "procedural omission[]" is "necessary, but not sufficient" to establish standing.  *Ctr. for Biological Diversity*, 861 F.3d at 183.  It "must also show" that the alleged failure by the agency "affects [the plaintiff's] members' concrete aesthetic and recreation interests" and "imperil[s] the members' particularized interests." *Id.* at 183 (cleaned up) (citing *WildEarth Guardians*, 738 F.3d at 305; *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 666 (D.C. Cir. 1996) (en banc)).  Put another way, an organization "must show . . . that the failure demonstrably increased some specific risk of environmental harms that imperil the members' particularized interests in a species or habitat with which the members share a geographic nexus." *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 592 (D.C. Cir. 2019) (cleaned up) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 666–68; *Ctr. for Biological Diversity*, 861 F.3d at 183–84).

For instance, in *Center for Biological Diversity v. EPA*, the plaintiff organization submitted a declaration from one of its members who expressed "recreational, scientific, aesthetic, educational, moral, spiritual and conservation interests in observing" the beetle species in question in its natural habitat, which the declarant "regularly visit[ed] three-to-four times a year" and

18

planned to continue visiting with the hope that he would see the beetle again. 861 F.3d at 183 (cleaned up). A second declarant affirmed that he was a frequent visitor to the habitat of the second species in question, a butterfly, and that he intended to return to look for the butterflies. *Id.* Applying a motion-to-dismiss standard, the D.C. Circuit held that these affiants had made a sufficient showing of a concrete and particularized injury to the plaintiff's members. *Id.* at 183–84.

Here, to support their standing, Plaintiffs submit the declaration of Jason Christensen, the Director of Yellowstone to Uintas Connection. Second Decl. of Jason Christensen, ECF No. 37 [hereinafter Christensen Decl.].[8] Christensen states that he has "been camping, hiking and fishing in the Upper Green River area for 33 years," and that his "favorite aspect of being in the Upper Green River area is looking for and viewing grizzly bears." *Id.* ¶ 9. "The grizzly bear is one of the species" that Christensen looks for when he is in the Upper Green River area and is one of his "favorite species to view." *Id.* ¶ 10. Christensen further affirms that he plans "to continue to visit this area in search of grizzly bears . . . for as long as [he is] able and [has] specific plans to return this summer." *Id.* ¶ 11. Christensen further elaborates that he has "a longstanding scientific, recreational, and aesthetic interest in the grizzly bear and its habitat," *id.* ¶ 12; he has "a strong appreciation for the role each animal plays in the ecosystem," *id.* ¶ 15; and every time he "learn[s] about a grizzly bear death due to livestock conflicts on the Upper Green River area, [he is] saddened," *id.* ¶ 23. He also has a "deep spiritual connection to the area and to the wildlife, including grizzly bears, that live in the Upper Green River area." *Id.* ¶ 16. Whenever Christensen

---

[8] Plaintiffs submitted the referenced declaration only after the court provided notice to the parties that they should be prepared to address standing at the preliminary injunction hearing. *See* 06/02/2020 Minute Order. Despite the last-minute filing, the court will consider the Christensen Declaration, as the defendant parties have had the opportunity to respond to it.

visits the Upper Green River area, he goes "with the hope and intention that [he] might see a grizzly bear." *Id.* ¶ 24.

The Cattle Rancher intervenor-defendants argue in opposition that, notwithstanding Christensen's declaration, Plaintiffs have not shown a concrete, particularized, and imminent harm. They assert that because "Plaintiffs' legally protected interest is in the species, not specific animals," Cattle Ranchers' Suppl. Br. at 4, and because "the 2019 [Biological Opinion] will not make Plaintiffs more likely to suffer legal harm" given that the grizzly bear population continues to increase and other factors mitigate the risk that female bears will be taken, Plaintiffs' concerns about the increased lethal removal of female bears are unsubstantiated, *id.* at 4–8. But that argument is really about the element of causation, not whether Christensen has asserted an injury to his "concrete aesthetic and recreational interests." *Ctr. for Biological Diversity*, 861 F.3d at 183. Christensen easily has established the requisite injury in fact.

        *2.    Causation*

"Establishing causation in the context of a procedural injury requires a showing of two causal links: 'one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury.'" *Ctr. for Biological Diversity*, 861 F.3d at 184 (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668). The second step can be further broken down "into two smaller causal connections": (a) one connecting the agency's failure with the harm to the species; and (b) one connecting the harm to the species to the member's interests. *Conservation Law Found. v. Ross*, 422 F. Supp. 3d 12, 23 (D.D.C. 2019).

In this case, Plaintiffs argue that: (1) FWS's failure to consider the effect of the UGRA Project on female grizzly bears led to the "no jeopardy" finding and the higher number of allowable

lethal takings, any number of which could be female bears; (2) the findings and allowances set forth in the 2019 Biological Opinion and Incidental Take Statement will harm the species because an unknown number of female bears could be lethally removed from the Project area; and (3) the harm to the species is directly connected to Christensen's interests because the loss of even one bear hurts his recreational and aesthetic interests.

The State of Wyoming counters that "[t]he section 7 violation alleged by [Plaintiffs] at this stage of the proceedings has nothing to do with the total amount of lethal grizzly bear take authorized by [FWS]" and that Plaintiffs "have not shown that [FWS] likely would have authorized fewer total grizzly bear mortalities in the Project area if it had addressed female grizzly bear mortality in the manner they espouse." Wyoming's Suppl. Br. at 5. In other words, the State contends that the alleged violation did not cause Plaintiffs' injury. The Cattle Rancher intervenor-defendants, as discussed, make a similar argument. But the intervenor-defendants demand more than is required to establish causation with respect to a procedural injury. "[I]n a procedural-injury case, a plaintiff need not show that better procedures would have led to a different substantive result." *Renal Physicians Ass'n v. U.S. Dep't of Health and Human Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). Put another way, a plaintiff need not demonstrate, as the intervenor-defendants insist, "that, but for the procedural defect, the final outcome of the rulemaking process would have been different[.]" *Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005). Under this standard, Plaintiffs have established causation between the alleged procedural deficiency and their member's injury. There is a reasonable causal connection between the agency's alleged failure to adequately consider the effect of a higher number of takings of female grizzly bears and the increased potential loss of species, which would injure Christensen's recreational and aesthetic interests.

<blockquote>3.     <em>Redressability</em></blockquote>

Finally, Defendants insist that Plaintiffs have not satisfied the element of redressability. Federal Defendants argue that "[e]ven if this Court were to grant Plaintiffs' motion, the Ranchers would still be allowed to lawfully graze their livestock on the allotments," the grazing cattle will likely "attract grizzly bears to the allotments and result in grizzly predation on cattle," making lethal removal necessary, and the Wyoming Game and Fish Department would then "be authorized to lawfully remove the predating bears pursuant to 50 C.F.R. § 17.40(b)." Fed. Defs.' Suppl. Br. at 3–4.   And "[b]ecause Wyoming and FWS . . . would retain this separate avenue for lethal removals, the requested preliminary injunction would not 'produce tangible, meaningful results in the real world.'" *Id.* at 5 (quoting *Common Cause v. Dep't of Energy*, 702 F.2d 245, 254 (D.C. Cir. 1983)); *see also* Cattle Ranchers' Suppl. Br. at 9–10 ("[L]ethal removal is permitted by the 4(d) Rule."). The Cattle Ranchers offer two additional reasons why Plaintiffs' purported harms are not redressable.  First, they contend that injunctive relief will not foreclose the non-lethal relocation of nuisance bears from the GYE, and so Christensen's recreational and aesthetic interests will be harmed even if lethal takings are prohibited.  Cattle Ranchers' Suppl. Br. at 8–9. Second, they insist that "lethal removal will continue to be available outside of the Project area," such as on non-federal lands outside of the Project area or private lands within the Project area. *Id.* at 9.   Accordingly, the bears might still be taken, regardless of an injunction preventing the lethal removals of nuisance bears from federal lands in the UGRA Project.  The court finds Defendants' arguments unpersuasive.

"[A] procedural right may permit a litigant to assert that right 'without meeting all the normal standards for redressability and immediacy.'" *Fla. Audubon Soc'y*, 94 F.3d at 668 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).  Instead, the redressability requirement

is "relaxed" when a plaintiff has alleged a procedural injury. *WildEarth Guardians*, 738 F.3d at 305–06. What "a more relaxed redressability requirement for procedural rights claims mean[s] is that, instead of needing to establish that compelling the agency to follow the correct procedure *would* lead to a substantive result that favors the [plaintiff's] concrete interests, the [plaintiff] need only show that its concrete interests *could* be better protected." *Narragansett Indian Tribal Historic Pres. Office v. Fed. Energy Regulatory Comm'n*, 949 F.3d 8, 13 (D.C. Cir. 2020). "In other words, the relaxed redressability requirement is met when correcting the alleged procedural violation *could* still change the substantive outcome in the [plaintiff's] favor; the [plaintiff] need not go further and show that it *would* effect such a change." *Id.* Plaintiffs have met this relaxed standard. They are not required to show that the alleged procedurally deficient 2019 Biological Opinion and Incidental Take Statement, if vacated and revisited, necessarily would lead to reduced or limited takings of female grizzly bears. They need only show that such a result *could* protect their interests. They have amply shown that to be the case here.

Defendants' arguments do compel a different result. With respect to their contention that lethal takings could nevertheless continue under the 4(d) Rule, which provides a general authorization for the taking of nuisance bears, *see* 50 C.F.R. § 17.40(b), that regulation and the interagency guidelines mentioned therein do not address the UGRA Project specifically and contain no numerical caps or time periods, *see id*; 2017 Grizzly Bear Recovery Plan Supplement at 6; *see also* 2019 BiOp at 17–18 (citing 2017 Grizzly Bear Recovery Plan Supplement). The preliminary injunctive relief sought, if granted, would prevent the lethal removal of bears within the UGRA Project and, if Plaintiffs ultimately prevail, the agency could place temporal and numerical limits on the taking of female grizzly bears. The Federal Defendants' general authority to take nuisance bears under the 4(d) Rule does not foreclose such a possible favorable outcome.

Additionally, the fact that non-lethal removals might continue in the UGRA Project area or that lethal killings could continue outside of it, does not mean that preliminary injunctive relief would not resolve the injury that Christensen claims:  harm to his recreational and aesthetic interests from the lethal taking of a grizzly bear within the UGRA Project area.  Thus, the preliminary relief sought, if granted, could redress the injury claimed.

## V.   LEGAL STANDARD

Having satisfied itself that Plaintiffs have standing as to their grizzly bear-related claim, the court turns now to the merits.  "A preliminary injunction is an extraordinary and drastic remedy" and "should never be awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks and citations omitted).  A plaintiff is entitled to such "extraordinary relief" only "upon a clear showing" that it is "entitled to such relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  Such a showing requires a plaintiff to establish that: (1) it is likely to succeed on the merits of its claim; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in [its] favor"; and (4) "that an injunction is in the public interest."  *Id.* at 20.  Any injunction issued by the court "should be narrowly tailored to remedy the harm shown."  *Nat. Treasury Emps. Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990) (citing *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985)).

The D.C. Circuit evaluates the four factors required for a preliminary injunction on a "sliding scale."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009) (quoting *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)).  If a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.  *Id.* at 1291–92.  Although the Supreme Court's decision in *Winter* cast some doubt on the viability of the sliding scale approach, *see id.* at 1296 (Kavanaugh,

J., concurring) ("[T]he old sliding-scale approach to preliminary injunctions . . . is 'no longer controlling, or even viable.'" (quoting *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)), the D.C. Circuit has yet to decide whether to abandon that test, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018).

Regardless of which approach the court takes, Plaintiffs in this case cannot prevail, as they have failed to establish irreparable harm. The court therefore need not consider the other injunctive relief factors. *See CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).[9]

## VI.    DISCUSSION

Plaintiffs argue that they will suffer an irreparable injury in this case because "it is undisputed that grizzly bears . . . will be killed as a result of FWS's authorization of 72 lethal grizzly removals" and that "more grizzly bears will be killed while the Court reaches a final decision on the merits of this case in the absence of a preliminary injunction." Pls.' Mot. at 20. Defendants counter that Plaintiffs have not demonstrated irreparable harm, because "Plaintiffs' argument is premised on the incorrect notion that the mortality of one ESA-listed animal constitutes irreparable harm," and further, the 4(d) Rule "*specifically authorizes* lethal removal of nuisance grizzly bears." Fed. Defs.' Opp'n at 15; *see also* State of Wyoming's Mem. of P. & A. in Opp'n to Pls.' Mot., ECF No. 23 [hereinafter Wyoming's Opp'n], at 9–14; Cattle Ranchers' Opp'n at 10–13.

As a general matter, an irreparable injury "must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). "[T]he party

---

[9] Plaintiffs encourage the court to adopt an "altered" preliminary injunction test from the Ninth Circuit, which essentially does away with the balancing-of-equities and public-interest factors. *See* Pls.' Mot. at 11–12, 21–22 (citing *Cottonwood Envtl. Law Ctr. v. U.S. Forest Service*, 789 F.3d 1075, 1090–91 (9th Cir. 2015)). But because Plaintiffs have failed to demonstrate irreparable harm, the result is the same regardless of which test the court adopts.

seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (cleaned up) (citation omitted). Further, the movant must "substantiate the claim that irreparable injury is 'likely' to occur." *Id.* (citation omitted). "Bare allegations of what is likely to occur" are insufficient because the court must decide "whether the harm will *in fact* occur." *Id.* Accordingly, "[t]he movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.*

The parties have offered competing theories as to the proper standard for an "irreparable injury" in the context of an ESA case. Plaintiffs argue that the taking of even a single threatened or endangered animal constitutes irreparable injury. Pls.' Mot. at 19. Plaintiffs point to *American Rivers v. United States Army Corps of Engineers* in which the district court quoted a holding from another case stating that:

> even when there was "not the remotest possibility that [the planned agency activity] during the period in which a preliminary injunction would be in place [would] eradicate the species," the strong congressional mandate contained in the ESA to protect endangered and threatened species supported the finding that "the loss even of the relatively few [individuals] that are likely to be taken through [an agency action] during the time it will take to reach a final decision in this case is a significant, and undoubtedly irreparable harm."

271 F. Supp. 2d 230, 258–59 (D.D.C. 2003) (quoting *Fund for Animals v. Turner*, Civ. A. No. 91-2201 (MB), 1991 WL 206232, at *8 (D.D.C. Sept. 27, 1991). The cited case, *Fund for Animals, Inc. v. Turner*, held that "the loss even of the relatively few grizzly bears that are likely to be taken through a sport hunt during the time it will take to reach a final decision in this case is a significant, and undoubtedly irreparable, harm," 1991 WL 206232, at *8, given that "Congress intended endangered species to be afforded the highest of priorities," *id.* (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978)). In *Turner*, the estimated killing of three to nine bears during the

pendency of the case was sufficient to establish irreparable harm. *Id.; see also Humane Soc'y of the U.S. v. Kempthorne*, 481 F. Supp. 53, 69 (D.D.C. 2006), *judgment vacated on other grounds by* 527 F.3d 181 (D.C. Cir. 2008) ("The Court agrees" that "[r]equiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head. Without the ability to enjoin illegal taking under the ESA, courts would be without power to prevent harm to endangered species before a species was on the brink of extinction.").

For their part, Defendants argue that to demonstrate irreparable harm, Plaintiffs must show that the activity they seek to enjoin "will substantially affect the species as a whole, not individuals." Fed. Defs.' Opp'n at 16 (citing *Pac. Coast Fed'n of Fishermen's Ass'ns v. Ross*, No. 1:20-cv-0431-DAD-SAB, 2020 WL 1699980, at *5 (E.D. Cal. Apr. 7, 2020)); *see also* Wyoming's Opp'n at 9–13. The only D.C. Circuit case that Defendants cite to support their position is *Fund for Animals v. Frizzell*, a case in which the court held that it could not accept the plaintiffs' "extreme contention that the loss of only one bird is sufficient injury to warrant a preliminary injunction; rather, a proponent of such an injunction must raise a substantial possibility that the harvest of excessive numbers of these waterfowl will irretrievably damage the species." 530 F.2d 982, 987 (D.C. Cir. 1975).

The court agrees that "[r]equiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head." *Kempthorne*, 481 F. Supp. 2d at 69. Furthermore, the D.C. Circuit has never applied *Frizzell* to a challenge, as here, brought under the ESA. *Frizzell* arose under the National Environmental Policy Act of 1969, and the court described the bird in question as "a reasonably abundant game species." 530 F.2d at 987. Applying *Frizzell* to a case involving a threatened species is a dubious proposition. *See Greater*

*Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1257 (10th Cir. 2003) (rejecting *Frizzell* standard in an ESA case).

But neither is the court convinced that the killing of a single member of a threatened species constitutes irreparable harm, especially where, as here, the grizzly bear population has been growing for years. *See* 2019 BiOp at ii, 14–16; Fed. Defs.' Opp'n, Decl. of Nathan Darnall, ECF No. 26-3 [hereinafter Darnall Decl.], ¶ 9.[10]   The case law simply does not support such a conclusion.   Even in *American Rivers*, relied on heavily by Plaintiffs, the court considered the "continued existence of" the species when making its harm finding.   271 F. Supp. 2d at 259. Ultimately, in this case, the court declines to adopt either extreme standard.   It suffices to say that Plaintiffs have not offered evidence of a "certain and great" harm that is "likely to occur."   *See Wis. Gas Co.*, 758 F.2d at 674.

The problem for Plaintiffs is that they are not starting from a baseline of zero takings. Rather, the court must take account of past numbers of lethal grizzly bears removals, as it is the increased margin of lethal takings that is the subject of Plaintiffs' claim.   Additionally, Plaintiffs are challenging FWS's failure to properly consider, and to cap, the lethal removal of *female* grizzlies. Pls.' Mot. at 13–16.   Accordingly, the possible harm that the court must consider is not the killing of all grizzly bears during the pendency of this case, but rather the killing of female bears.   Plaintiffs point to FWS's estimates that five bears could be lethally removed from the allotments in 2020, and six bears in 2021. Pls.' Mot. at 20 (citing 2019 BiOp at 44, 49).   Plaintiffs do not, however, offer any estimate of how many of those bears is likely to be female.   In fact, for several reasons, the data and the evidence before the court suggest that the taking of more than one or two female bears during the pendency of this case is unlikely to occur.

---

[10] The court expresses no view on whether the taking of a single *endangered* species would constitute irreparable harm.

For one thing, historical data shows little variance in lethal takings of female grizzly bears over the last decade.  Between 2010 and 2019, seven female bears were lethally removed from the UGRA Project area, an average of 0.7 females bears per year (out of a total 38 bears that were taken during those years), with no more than two taken in a single year.  Fed. Defs.' Opp'n, Decl. of Dr. Hilary Cooley, ECF No. 26-2 [hereinafter Cooley Decl.], ¶ 18;  Darnall Decl.¶ 16.  The annual rate is even lower over the last three years.  No female bears were taken in 2019, one was taken in 2018, and none were taken 2017.  Cooley Decl. ¶ 18; Darnall Decl. ¶ 16.  Although Plaintiffs fear an overall increase in the number of takings over the next decade, *see* Compl. ¶¶ 96–97, Plaintiffs have not presented any evidence suggesting that the number of female grizzly bear takings will deviate from past data during the lifecycle of this case.

There are other reasons to believe that the taking of female grizzly bears will not suddenly spike.  The lethal taking of a nuisance bear is a last resort, and there are many checks in the process to ensure that the killing of such a bear, especially a female, cannot be a sudden or spur-of-the-moment decision.  The 2019 Biological Opinion notes that "management removal is a management tool available for specific, chronic depredation situations, to be used in conjunction with other measures that focus on preventing and minimizing the causes of livestock-grizzly bear conflicts." 2019 BiOp at 44–45.  The Wyoming Game and Fish Department's "conflict management program will focus on education and preemptive management strategies" and "[n]on-lethal control measures will be exercised whenever appropriate and practical."  *Id.* at 33–34.  The Biological Opinion sets forth other tactics that the agency should use before lethally taking a bear.  *Id.*  In fact, management removals are only employed "when other options are not practical or feasible." *Id.*  at 34.  Further, "[l]ocation, cause of incident, severity of incident, history of the offending grizzly bear(s), and bear's health, age, and sex will be considered in any decisions about

appropriate management actions." *Id.* The final decision on whether a lethal removal is necessary requires more than one agency—the decision is made by FWS's Grizzly Bear Recovery Coordinator in close coordination with the Wyoming Game and Fish Department. *Id.* at 44.

Applicable regulations also place restrictions on the taking of a nuisance grizzly bear. The 4(d) Rule permits the removal of a nuisance bear only if "[i]t has not been reasonably possible to eliminate such threat or depredation by live-capturing and releasing unharmed in a remote area the grizzly bear involved." 50 C.F.R. § 17.40(b). Further, FWS's Grizzly Bear Recovery Plan imposes an additional numerical limit on the lethal removal of nuisance bears by setting mortality thresholds of 9 percent for independent female bears, 9 percent for dependent young, and 20 percent for independent males. 2017 Grizzly Bear Recovery Plan Supplement at 6. Under the Revised Demographic Recovery Criteria, "[i]f mortality limits are exceeded for any sex/age class for three consecutive years and any annual population estimate falls below 612 . . . , the IGBST will produce a Biology and Monitoring Review to inform the appropriate management response." *Id.* at 5; *see also* 2019 BiOp at 18. These built-in checks will restrain the number of female bear takings in the immediate future, even without a numerical limit.

Finally, an equitable consideration weighs against granting injunctive relief: Plaintiffs' unexplained delay in bringing this suit. FWS issued the 2019 Biological Opinion in April 2019, *see* 2019 BiOp, and the 2019 Record of Decision on October 11, 2019, *see* UGRA Record of Decision. At oral argument, Plaintiffs admitted that they learned of the Record of Decision the same month it was issued and obtained the 2019 Biological Opinion shortly thereafter. *See* Rough Tr. at 19. Yet, Plaintiffs waited over three months, until January 24, 2020, before supplying Federal Defendants with the statutorily required 60-day notice of their intent to file a lawsuit alleging violations of the ESA. Compl. ¶ 14; *see also* 16 U.S.C. § 1540(g)(2)(A)(i). Plaintiffs

filed suit shortly after the 60-day notice period expired, *see* Compl. (filed on March 31, 2020), but then waited another five weeks before filing their Motion for Preliminary Injunction, *see* Pls.' Mot. (filed on May 8, 2020). These unexplained delays in seeking emergency relief undermine their contention that they will be irreparably harmed absent an injunction. *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (finding that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm" (collecting cases)); *Frizzell*, 530 F.2d at 987 (holding that a delay of forty-four days before seeking injunctive relief was "inexcusable" and "bolstered" the "conclusion that an injunction should not issue," particularly where the party seeking the injunction had knowledge of the pending nature of the alleged irreparable harm).[11]

## VII.  CONCLUSION

For the foregoing reasons, the court denies Plaintiffs' Motion for Preliminary Injunction, ECF No. 15.

Dated:  June 19, 2020

Amit P. Mehta
United States District Court Judge

---

[11] Federal Defendants argue that Plaintiffs could have brought their suit even earlier if they had asserted only APA claims, which are not subject to a 60-day notice requirement. Fed. Defs.' Suppl. Br. at 4 n.3. But it is doubtful that Plaintiffs could have avoided the ESA's notice regime by filing under the APA. An APA claim is not available where there is another adequate remedy, and courts have recognized that the ESA provides such a remedy. *See Friends of Animals v. Salazar*, 670 F. Supp. 2d 7, 15 (D.D.C. 2009). Thus, Plaintiffs likely could not have advanced an APA claim, if at all, any sooner than an ESA claim.